131 P.3d 892 (2006)
A.H. LARSON; Terrance Scott Wean; Lisa G. Olsen; John Speirs; Kenneth H. Torp; Arthur L. Wahl; B.L. Fox and Peter H. Nickerson, and on behalf of all others similarly situated, Appellants,
v.
SEATTLE POPULAR MONORAIL AUTHORITY; Washington State Department of Licensing; and Fred Stephens, its director, Respondents.
Supreme Court of Washington, En Banc.
Argued September 27, 2005.
Decided March 30, 2006.
As Amended May 24, 2006.
*893 Henry M. Aronson, Norman J. Bruns, Attorneys at Law, Camden Michael Hall, Camden Hall, PLLC, William Colwell Severson, William C. Severson, PLLC, Seattle, WA, for Appellants.
Laura Kristine Clinton, Mark Gerard Jackson, Paul J. Lawrence, Preston Gates & Ellis LLP, Seattle, WA, Jerald R. Anderson, Linda Marie Moran, Attorneys at Law, Donald F. Cofer, Cameron Gordon Comfort, Atty Generals Ofc/Revenue Division, Olympia, WA, for Respondents.
MADSEN, J.
¶ 1 Appellants, each a resident and motor vehicle owner in Seattle, challenge the trial court's order on summary judgment dismissing all of their claims relating to the creation of the Seattle Popular Monorail Authority (SMP) and SMP's imposition of a motor vehicle excise tax (MVET), as collected by the Department of Licensing. Appellants claim that taxing authority was improperly delegated to SMP under the state constitution; that the MVET is an excise tax; that SMP lacked jurisdiction to impose the MVET; and that the MVET is improperly imposed.
¶ 2 This court has recently addressed several of the Appellants' arguments in Sheehan v. Central Puget Sound Regional Transit Authority, 155 Wash.2d 790, 123 P.3d 88 (2005).[1] Consistent with our decision in Sheehan, we hold that the MVET is an excise tax and that local taxing authority was properly delegated to SMP. Additionally, we hold that the MVET is imposed consistent with the petition approved by the voters and chapter 35.95A RCW. We affirm the trial court.

FACTS
¶ 3 SMP was formed in 2002, pursuant to chapter 35.95A RCW, to perform a public monorail transportation function within the city of Seattle. As required by chapter 35.95A RCW, a majority of voters in Seattle approved the creation of SMP and authorized SMP to levy and collect the MVET to help pay for the cost of acquiring, designing, constructing, equipping, maintaining, and operating the monorail.
¶ 4 As provided in RCW 35.95A.020, SMP is a "city transportation authority," which is a "municipal corporation." Under RCW 35.95A.080, SMP has the power to levy and collect an MVET not exceeding 2.5 percent on the value of motor vehicles owned and licensed by residents of Seattle. However, pursuant to Seattle Citizen Petition No. 1(approved by Seattle voters November 2002), SMP, without further voter approval, may only impose the MVET on up to 1.4 percent on the value of such vehicles.
¶ 5 Pursuant to RCW 35.95A.030, Seattle voters also approved of the selection process for the governing body of SMP. As set forth in Seattle Citizen Petition No. 1, SMP's governing body, a permanent board, consists of both elected and appointed board members. During the initial start-up year, SMP's board *894 authorized the MVET to be levied and collected at a rate of 0.85 percent on a vehicle's assessed value. The full voter-approved rate of 1.4 percent was imposed in June 2004.
¶ 6 Appellants are eight motor vehicle owners who reside in Seattle. In October 2004, Appellants filed a complaint in King County Superior Court, alleging that the MVET was invalid on multiple constitutional and statutory grounds. Appellants filed this action as a class action, but apparently never sought class certification. Br. of Resp't SMP at 13. In December 2004, Respondents, SMP and the Department of Licensing, filed a motion for summary judgment dismissing all of Appellants' claims. On March 3, 2005, Appellants filed a cross-motion for summary judgment declaring the MVET illegal. On March 22, 2005, Appellants filed a motion for a preliminary injunction to restrain the Department of Licensing from remitting MVET payments to SMP. In April 2005, after a hearing on the motions, the trial court granted the Respondents' summary judgment motion and dismissed all of Appellants' claims and denied Appellants' motion for a preliminary injunction.

ANALYSIS
¶ 7 Appellants' first contend that there was an impermissible delegation of local taxing authority under the Washington Constitution because some of SMP's board members are appointed rather than elected. Appellants contend that it is unconstitutional for unelected board members to be delegated legislative taxing authority. Pursuant to RCW 35.95A.030,[2] Seattle voters approved the size and selection process for the governing body of SMP, a board, which included having some board members appointed to their positions.
¶ 8 The Washington Constitution contains two provisions regarding local taxation. Article XI, section 12 of the Washington Constitution, entitled, "Assessment and Collection of Taxes in Municipalities," states:
The legislature shall have no power to impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof, the power to assess and collect taxes for such purposes.[3]
Similarly, article VII, section 9, entitled "Special Assessments or Taxation for Local Improvements," states:
The legislature may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of property benefited. For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes and such taxes shall be uniform in respect to persons and property within the jurisdiction of the body levying the same.[4]
*895 ¶ 9 A party challenging a statute's constitutionality bears the heavy burden of establishing its unconstitutionality. Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762 (2000); Hemphill v. Tax Comm'n, 65 Wash.2d 889, 891, 400 P.2d 297 (1965). This standard is met if argument and research show that there is no reasonable doubt that the statute violates the constitution. Amalgamated Transit, 142 Wash.2d at 205, 11 P.3d 762.
¶ 10 Appellants do not point to any language in the Washington Constitution that supports their position that it is unconstitutional for unelected board members to be delegated legislative taxing authority. The State contends that under Appellants' claim, this court would be required to "engraft" language onto the constitution, an impermissible action.
¶ 11 As a general rule, when interpreting constitutional provisions, we look first to the plain language of the text and will accord it its reasonable interpretation. Wash. Water Jet Workers Ass'n v. Yarbrough, 151 Wash.2d 470, 477, 90 P.3d 42 (2004). If the text is clear, then no construction or interpretation is necessary. Wash. Water Jet Workers Ass'n v. Yarbrough, 148 Wash.2d 403, 431, 61 P.3d 309 (2003) (Bridge, J., dissenting).
¶ 12 Article XI, section 12 clearly establishes that the state legislature may delegate to the corporate authorities of municipalities the power to tax such municipalities, their inhabitants, and property for local purposes. The legislature is expressly prohibited from direct taxation of municipalities and their inhabitants and property for local purposes.
¶ 13 In this case it is undisputed that SMP is a municipal corporation. In RCW 35.95A.020(1), the legislature provided in relevant part that "[a] city transportation authority. . . may be created in every city with a population greater than three hundred thousand to perform a public monorail transportation function. The authority shall embrace all the territory in the authority area. A city transportation authority is a municipal corporation." It is also undisputed that SMP, a city transportation authority, was properly established pursuant to chapter 35.95A RCW and that SMP is exercising its taxing authority for a local purpose, establishing a monorail within the city of Seattle. Thus, under the plain language of the constitution, the legislature is not limited in its ability to delegate taxing authority to SMP, a municipal corporation.
¶ 14 Notwithstanding the lack of any limiting language in the relevant taxing provisions, Appellants maintain that it was unconstitutional, under case law, for the legislature to delegate local taxing authority to SMP because some of SMP's board members are appointed.
¶ 15 Appellants rely primarily on one case, Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762. Amalgamated Transit concerned the constitutionality of Initiative 695 which, among other requirements, required the legislature to submit future tax increases to the voters for approval. Id. at 192, 11 P.3d 762. This provision resulted in all such tax legislation being transformed into conditional legislation, requiring voter approval for finalization. Id. This court held that that provision of Initiative 695 was unconstitutional. Id.
¶ 16 Under article II, section 1, the legislative authority of the State is vested in the legislature and it is unconstitutional for the legislature to abdicate or transfer its legislative function to others. Amalgamated Transit, 142 Wash.2d at 234, 11 P.3d 762(citing Brower v. State, 137 Wash.2d 44, 54, 969 P.2d 42 (1998)). Article II, section 1 also provides for the initiative and referendum powers, which are the people's legislative powers. The referendum power of the people has two forms. The people can petition for referendum of legislation that the legislature has passed. CONST. art. II, § 1(b); Amalgamated Transit, 142 Wash.2d at 191, 11 P.3d 762. To do so, four percent of the voters must sign a petition. Alternatively the legislature may refer a measure to the people. The court held that section 2 of Initiative 695, which required voter approval of all future tax legislation passed by the legislature but did not require a petition of the voters as to the specific piece of legislation, nor referral by the legislation, established a *896 referendum procedure that was not allowed under the state constitution. Amalgamated Transit, 142 Wash.2d at 191, 11 P.3d 762. Accordingly, this court held that Initiative 695 violated article II, section 1(b). Id.
¶ 17 Appellants contend that Amalgamated Transit controls this case. Specifically, Appellants claim that as in Amalgamated Transit, which concerned an unconstitutional delegation of legislative taxing authority to the people of this state, there is an unconstitutional delegation of legislative taxing authority to SMP's nonelected board members. Appellants' Replacement Br. at 16-17.
¶ 18 First, we cannot ignore Appellants' misrepresentation of the holding in Amalgamated Transit upon which they rely. Apparently believing that this court is unfamiliar with its own cases, Appellants inaccurately quote from the case. Appellants state that this court said:
There is no question that under Art. XI, § 12 the Legislature cannot delegate its legislative authority. As noted, "[I]t is unconstitutional for the legislature to abdicate or transfer to others its legislative function."
Appellants' Replacement Br. at 17 (emphasis added) (claiming to quote Amalgamated Transit, 142 Wash.2d at 237-41, 11 P.3d 762). However, the correct quotation is:
There is no question that under article II, section 1 the Legislature cannot delegate its legislative authority. As noted, "`[I]t is unconstitutional for the legislature to abdicate or transfer to others its legislative function.'"
Amalgamated Transit, 142 Wash.2d at 237-38, 11 P.3d 762 (emphasis added) (quoting King County v. Taxpayers of King County, 133 Wash.2d 584, 604, 949 P.2d 1260 (1997)). This error is alarming and misleading. At best, Appellants' error represents sloppiness. As discussed above, the relevant holding in that case involved the interpretation of article II, section 1, not article XI, section 12.
¶ 19 Appellants cannot make a square peg fit into a round hole by misquoting a case and by failing to explain its holding, and we are greatly disturbed by the attempt. The pertinent part of Amalgamated Transit involved delegation of taxing authority in violation of the referendum powers contained in article II, section 1, not the legislature's ability to delegate local taxing power as provided in article XI, section 12. As discussed by SMP, when the people of Washington State adopted the constitution, they vested legislative power with the legislature. Br. of Resp't SMP at 16 (citing Amalgamated Transit, 142 Wash.2d at 238, 11 P.3d 762). Although the people later reserved initiative and referendum powers, those powers may only "be exercised in conformity with the constitutionally mandated procedures." Id. (citing Amalgamated Transit, 142 Wash.2d at 242, 11 P.3d 762). This court held that Initiative 695 violated the referendum procedures and therefore was a delegation to the voters of legislative taxing authority that was unconstitutional. Amalgamated Transit, 142 Wash.2d at 191, 11 P.3d 762. In contrast, under the relevant constitutional provisions in this case, article XI, section 12 and article VII, section 9, the constitution expressly provides that the legislature may delegate local taxing authority to municipalities.
¶ 20 Appellants contend that delegation of legislative taxing power to a nonrepresentative entity is never allowed, maintaining that ministerial functions may only be delegated. Appellants repeatedly claim that the procedural safeguards that are provided in this case are irrelevant and that to the extent that Granite Falls Library Capital Facility Area v. The Taxpayers of Granite Falls Library Capital Facility Area, 134 Wash.2d 825, 953 P.2d 1150 (1998) (and any other case), holds otherwise, Amalgamated Transit overrules it. See, e.g., Appellants' Replacement Br. at 23, 25-26. As discussed above, Appellants' reliance on Amalgamated Transit is fatuous.
¶ 21 On the other hand, Granite Falls is instructive, particularly in the dissent. As Justice Sanders stated in his dissent and contrary to Appellants' claim, delegation of taxing power is permitted when "the Legislature clearly defines the purpose of the delegation and creates procedural safeguards to control arbitrary administrative action." Granite Falls, 134 Wash.2d at 845, 953 P.2d *897 1150(citing Barry & Barry, Inc. v. Dep't of Motor Vehicles, 81 Wash.2d 155, 159, 500 P.2d 540 (1972)).
¶ 22 In Barry & Barry, the court provided a two-part test to determine when legislative authority is properly delegated to nonrepresentative entities or officials. Barry & Barry, 81 Wash.2d at 159, 500 P.2d 540. First, the legislature must provide standards or guidelines which define in general terms what is to be done and identifies the entity which is to accomplish it. Id. Second, procedural safeguards must exist to control arbitrary administrative action and any administrative abuse of discretionary power. Id.
¶ 23 Thus, it is clear that it is constitutionally permissible for nonrepresentative bodies, e.g., entities that are governed by nonelected board members or officials, to be delegated legislative authority, as long as certain standards or guidelines are provided and procedural safeguards exist. Id. See also King County Water Dist. No. 54 v. King County Boundary Review Bd., 87 Wash.2d 536, 545, 554 P.2d 1060 (1976) (governmental entities with unelected officials may constitutionally be delegated authority, including the power to legislate, as long as there are safeguards to protect against injustice on account of unnecessary and uncontrolled discretionary power); King County v. Taxpayers of King County, 133 Wash.2d 584, 605-07, 949 P.2d 1260 (1997); Burba v. City of Vancouver, 113 Wash.2d 800, 805-06, 783 P.2d 1056 (1989); Robison v. Dwyer, 58 Wash.2d 576, 583-84, 364 P.2d 521 (1961).
¶ 24 In this case, the two-part test provided in Barry & Barry is satisfied. First, the legislature has provided the necessary guidelines defining in general terms what is to be done and has properly identified the entity which is to accomplish it. In RCW 35.95A.020, the legislature authorizes a newly created "city transportation authority" to perform a public monorail transportation function which may be created in every city with a population greater than 300,000. This city transportation authority is to perform its public transportation function within the territory of its authority area. Id. The city transportation authority is authorized, after receiving voter approval, to levy taxes and issue bonds to pay for the public monorail. See, e.g., RCW 35.95A.020(2), .050, .070, .080. Thus, the legislature has defined in general terms what is to be done.
¶ 25 Second, multiple procedural safeguards exist to control arbitrary administrative action and administrative abuse of discretionary power. For example, the legislature provided that the MVET could not exceed 2.5 percent on the value of every motor vehicle subject to the excise tax. RCW 35.95A.080. Seattle voters further limited that tax to 1.4 percent of the value of such vehicles. Clerk's Papers (CP) at 535. All such taxes collected by the authority must be used solely for paying all or a part of the cost of acquiring, designing, construction, equipping, maintaining, or operating public monorail transportation facilities, including contracting for services and paying or securing payment on any issued bonds. RCW 35.95A.110. The authority is subject to all standard requirements of a governmental entity pursuant to RCW 35.21.759. RCW 35.95A.040.[5]
¶ 26 Additional procedural safeguards provided in Seattle Citizen Petition No. 1 include: (1) without further voter approval, the authority will not be able to (a) issue more than $1.5 billion in debt for an initial monorail line and second-line planning, (b) continue to levy the MVET after all the initial phase debt has been paid, (c) use the MVET *898 after 2020 to pay for the noncapital costs of operating or maintaining the Green Line, (2) the requirement that public input must be sought before persons are nominated for possible appointment to the board and that all persons on the board must be legally registered voters of the authority area, and (3) the authority is prohibited from accumulating a surplus from the proceeds of the MVET beyond Phase 1 expenses that are required for prudent management. CP at 535-45. Thus, given the guidelines and procedural safeguards in this case, we conclude that the delegation of legislative taxing authority to SMP is constitutionally permissible.
¶ 27 Moreover, Seattle voters expressly approved the creation of SMP, the imposition of the MVET, and the selection process of the governing board as required by RCW 35.95A.020(2), .030(1), and .080(5). Appellants claim that it is irrelevant that voters in Seattle approved the creation of SMP and the selection process for the board of SMP. As discussed above, Appellants again inappropriately rely on Amalgamated Transit. Long standing Washington case law and commentators agree that voter approval of a local board selection is an appropriate delegation of power to an appointed board of a municipal corporation. See, e.g., State ex rel. Tax Comm'n v. Redd, 166 Wash. 132, 140-41, 6 P.2d 619 (1932) (permissible corporate authorities of municipal corporations include municipal officers who are appointed in some mode to which local persons have given their assent); 1 Thomas M. Cooley, The Law of Taxation 207 (4th ed.1924), ("Of course, if the people of a local district have in any way consented to the delegation of the power to tax a to a local [appointed] board, they cannot contest the validity of the delegation of power").
¶ 28 Appellants' next claim, that the MVET is an unlawful property tax, was recently addressed in Sheehan, 155 Wash.2d at 790, 123 P.3d 88, where this court concluded that the MVET is an excise tax and not a property tax. We see no reason to revisit the issue.
¶ 29 Similarly, we have also addressed Appellants' contention that SMP lacks jurisdiction to impose the MVET because it is not imposed on a proper taxable event in its taxing district. Appellants claim that the taxing event is not the registration of motor vehicles but the residence of the owners. Appellants are incorrect. As this court recently held in Sheehan, the taxing event is the relicensing of a motor vehicle within the district.
¶ 30 A taxing entity has jurisdiction to impose a tax when the taxable event occurs within the territorial limits of the taxing entity and, as a matter of due process, that taxable incident forms a sufficient contact, or nexus, with the taxing entity. See, e.g., Dravo Corp. v. City of Tacoma, 80 Wash.2d 590, 597-602, 496 P.2d 504 (1972) (holding that a tax levied on the gross receipts of a contract that was executed in Tacoma, the taxable event, but performed entirely in Lewis County complied with due process requirements because the city provided an environment of an orderly, civilized society in which Dravo was able to engage in the business transaction); Greyhound Lines, Inc. v. City of Tacoma, 81 Wash.2d 525, 503 P.2d 117 (1972) (the taxable event, sale of bus tickets in Tacoma, was sufficient nexus or link with City of Tacoma, even though some passengers and freight went to points outside Tacoma and that passengers and freight traveling through Tacoma were exempt from the tax).
¶ 31 In this case, as discussed in Sheehan, the taxing event is within SMP's taxing district. Additionally, there is a sufficient nexus between the taxing event and SMP because Seattle residents are the primary beneficiaries of the city monorail. Consistent with Dravo and Greyhound Lines, we hold that SMP has jurisdiction to impose the MVET.
¶ 32 Finally, Appellants claim that the imposition of the MVET is unlawful because it substantially departs from the petition approved by the voters. Appellants' claim is without merit.
¶ 33 When voters approve taxes for a public project, major deviations to the project are not within the government's lawful power. Sane Transit v. Sound Transit, 151 Wash.2d 60, 68, 85 P.3d 346 (2004). Minor deviations are permitted. Id. Appellants take issue with two aspects of the MVET's *899 imposition: the fact that newly purchased vehicles are exempt from the tax and that the assessed value of vehicles is determined by a depreciation schedule created by the Department of Licensing. In both of these cases, the MVET is imposed consistent with the petition and chapter 35.95A RCW.
¶ 34 Contrary to Appellants' assertion, the fact that newly purchased motor vehicles are exempt from the MVET does not conflict with the petition that provides in part that "[t]he authority can levy an annual special excise tax not to exceed 1.4 percent on the value of every motor vehicle owned by a Seattle resident." CP at 535. In this case, the MVET is imposed on newly purchased motor vehicles beginning the first year each newly purchased vehicle is relicensed. The petition specifically refers to the enabling legislation, chapter 35.95A RCW, which provides that "[t]he special excise tax imposed under RCW 35.95A.080(1) will be collected at the same time and in the same manner as relicensing tab fees under RCW 46.16.0621 and 35.95A.090." RCW 35.95A.130 (emphasis added).
¶ 35 Additionally, the use of the depreciation schedule created by the Department of Licensing is appropriate.[6] Neither the petition nor chapter 35.95A RCW uses the term "fair market value" in the context of the MVET. As the trial court stated:
To fund their monorail, Seattle voters took upon themselves an obligation to pay an MVET calculated at up to 1.4% of the "value" of their vehicles. The word "value" certainly connotes a value-laden concept and there can be reasonable dispute over what it means in different contexts. However, this Court must conclude that Seattle voters approved an MVET calculation that was based upon the statutorily established valuation methodology rather than upon the expectation of a curbside appraisal of each individual Ford or Ferrari with its added dings and dents, woofers and tweeters. That such a tax bite could, in certain cases, result in an amount greater  or lower  than 1.4% of the vehicle's current actual "fair market value" is of no moment. The voters approved a tax to be calculated according to an objective methodology required by law in effect at the time of their vote. Democratic values compel this conclusion.
The administrative efficiencies realized through this valuation methodology (presumably, with some corresponding savings to the taxpayers) make this a reasonable approach that is neither arbitrary nor capricious.
CP at 1064. The Appellants now concede that actual fair market value is inappropriate: "No one contends that Petition No. 1 requires a `curbside appraisal' of every car. Obviously, the valuations must be made using mass appraisal methodologies for the tax to be practically administered." Appellants' Replacement Br. at 54. However, Appellants point to no language in the petition or in chapter 35.95A RCW that suggests that some new, never used, methodology would be created to provide for some "different" type of mass appraisal methodology. Accordingly, we hold that the MVET is imposed consistent with the petition and chapter 35.95A RCW.

CONCLUSION
¶ 36 Consistent with Sheehan, we hold that the MVET is an excise tax and that SMP has jurisdiction to impose the MVET. We also hold that the local taxing authority was properly delegated to SMP and that the imposition of the MVET is lawful.[7]
¶ 37 We affirm the trial court.
*900 ALEXANDER, C.J., C. JOHNSON, BRIDGE, CHAMBERS, OWENS and FAIRHURST, JJ., concur.
J.M. JOHNSON, J. (dissenting).
¶ 38 The Seattle Popular Monorail Authority (Monorail) was formed in 2002 by voters of Seattle pursuant to chapter 35.95A RCW. The Monorail Governing Board (Board) consists of seven appointed members and only two members elected by Seattle voters at large. The Board has authorized taxing of Seattle residents who own vehicles, through a Monorail motor vehicle excise tax (MVET) at an annual rate of 1.4% of the "value" of each car.
¶ 39 The Monorail MVET is actually collected by the Department of Licensing (DOL) when a vehicle's registration is renewed. The tax is collected on every vehicle owned by Seattle residents, regardless of whether the vehicle is located or used in Seattle. For purposes of the Monorail tax only, DOL determines the vehicle's taxable value from the manufacturer's suggested retail price (MSRP), which is then depreciated using a schedule that DOL used before voters repealed the state MVET. The schedule and the "value" substantially overstate the actual market value of vehicles. As a result, the amount of tax charged to each motor vehicle owner is far more than 1.4% of market value, and the tax revenue to Monorail substantially increased (by millions of dollars).
¶ 40 In upholding this Monorail MVET as set by the Board, a majority of this court disregards the fundamental principle of "no taxation without representation." The majority upholds the taxation of local residents by an unelected board. The majority also sustains as an "excise" tax a measure that cannot be distinguished from an improper ad valorem tax. Finally, the majority upholds the use of a tax valuation schedule that clearly produces excessive valuations (and tax) and which voters in this state have twice repealed. The voice of the people in their own selfgovernment is diminished. I dissent.

ANALYSIS

A. Tax Set by Unelected Board; "Taxation Without Representation"

¶ 41 The Monorail MVET tax is invalid because it was set by an unelected board in violation of a fundamental constitutional principle of no taxation without representation. By this principle, only elected or legislative bodies may exercise the power of taxation.[1] Unelected bodies cannot be delegated the legislative power to tax citizens. Here, the power of establishing taxation levels was improperly delegated to an appointive, nonlegislative body  the Board. The majority of the Board is not accountable to the people through elections (only two were elected). The power to tax cannot be delegated to such a board under our constitution because neither the legislature nor the people can alienate this essential legislative function.
¶ 42 No taxation without representation is a fundamental principle vindicated in the American Revolution, by the adoption of the United States Constitution, and adhered to throughout this nation prior to Washington's admission to statehood.[2]
¶ 43 Adherence to the principles of the United States Constitution and of the Declaration of Independence was an express condition of our admission to the Union as a state on equal footing. The State's Enabling Act provides:
That the delegates to the conventions elected as provided for in this act shall meet at the seat of government of each of said Territories . . . and, after organization, *901 shall declare, on behalf of the people of said proposed States, that they adopt the Constitution of the United States; whereupon the said conventions shall be, and are hereby, authorized to form constitutions and States governments for said proposed states, respectively. The constitutions shall be republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed, and not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence.
Enabling Act, ch. 180, sec. 4, 25 Stat. 676 (1889).[3]
¶ 44 The Washington State Constitution begins with the recognition that "[a]ll political power is inherent in the people," WASH. CONST. art. I, § 1. The power to tax must derive from delegation of the peoples' power under our state constitution. See also WASH. CONST. art. I, § 19. Article I, section 32 states: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government."
¶ 45 Washington Constitution article XI, section 12 and article VII, section 9 do empower the legislature to delegate taxing authority to local governments, but the legislature may make such delegation only to elected bodies that are directly accountable to citizens.
¶ 46 This court's case law recognizes taxing power as inherently legislative. "Taxes are defined to be `burdens or charges imposed by legislative authority on persons or property, to raise money for public purposes . . . .'" State ex rel. Nettleton v. Case, 39 Wash. 177, 182, 81 P. 554 (1905) (quoting 27 AM. & ENG. ENCY. LAW 578 (2d ed.1905)). "It is elementary that the power of taxation, subject to constitutional limitations, rests solely in the legislature." State ex rel. Tacoma Sch. Dist. v. Kelly, 176 Wash. 689, 690, 30 P.2d 638 (1934); Love v. King County, 181 Wash. 462, 467, 44 P.2d 175 (1935).[4]
¶ 47 Prior cases also affirm constitutional limits on the legislature's grant of taxing authority. "It is a legal tenet, universally accepted, that the power of a county or other municipal corporation to tax is not an inherent, but a delegated, power." Love, 181 Wash. at 468, 44 P.2d 175 (citing 1 Thomas M. Cooley, THE LAW OF TAXATION §§ 119, 122, at 264, 276 (4th ed.1924)); Great N.R. Co. v. Stevens County, 108 Wash. 238, 243, 183 P. 65 (1919); State ex rel. Sch. Dist. v. Clark County, 177 Wash. 314, 322, 31 P.2d 897 (1934). "Municipal corporations have no inherent power to levy taxes. Their powers are derived through legislative grant, and are strictly construed. No implications are indulged to expand the powers granted." Kelly, 176 Wash. at 690, 30 P.2d 638 (citing 1 Cooley, supra, §§ 123, 124, 125).
¶ 48 In Malim v. Benthien, 114 Wash. 533, 196 P. 7 (1921), this court held that fairness and equality required that residents outside a district and without a voice in selecting its officers should not be subject to its taxing power. Malim, 114 Wash. at 539, 196 P. 7. "To uphold such a course would be a denial of the principle [of no taxation without representation] *902 upon which our government is founded, and which as a nation we have always maintained is the only true principle upon which a free government can be founded and maintained." Id.
¶ 49 Similarly, in State ex rel. State Tax Commission v. Redd, 166 Wash. 132, 6 P.2d 619 (1932), this court voided a statute requiring a county to tax local lands in accordance with the (unelected) state tax commission's valuation. This court recognized its obligation to "`give force and effect to the principle of local self-government which has always been regarded as fundamental in our political institutions, and to be the very essence of every republican form of government.'" Id. at 144, 6 P.2d 619(quoting People ex rel. Town of Pelham v. Vill. of Pelham, 215 N.Y. 374, 382, 109 N.E. 513 (1915)). It observed:
"The power of taxation is, of all the powers of government, the one most liable to abuse, even when exercised by the direct representatives of the people, and if committed to persons who may exercise it over others without reference to their consent, the certainty of its abuse would be simply a question of time."
Id. at 141, 6 P.2d 619(quoting Harward v. St. Clair & Monroe Levee & Drainage Co., 51 Ill. 130, 135 (1869)).
¶ 50 The later case of Municipality of Metropolitan Seattle v. City of Seattle, 57 Wash.2d 446, 357 P.2d 863 (1960), suggests taxing authority can be delegated to appointed boards, but only if those boards are composed of members who hold an elective office. The board in Metropolitan Seattle consisted entirely of elected officials automatically appointed to the board. This court held the appointed officials to be sufficiently accountable to the people subject to taxation because they were appointed from amongst "the ranks of elected officers residing within the region." Id. at 454, 357 P.2d 863.
¶ 51 More recently, the dissenting opinion in Granite Falls Library Capital Facility Area v. Taxpayers of Granite Falls reiterated our state constitution's respect for the principle of no taxation of representation. 134 Wash.2d 825, 848, 953 P.2d 1150 (1998) (Sanders, J., dissenting) ("[T]axation without representation was not popular with the colonists then and is unconstitutional today.").
¶ 52 Granite Falls involved a constitutional challenge to the establishment of a library taxing district governed by three appointed members from the Snohomish County Council. The dissent concluded that "[t]he Legislature may not constitutionally grant the power of taxation to persons over whom the taxpayers can exercise no control." Id. at 845, 953 P.2d 1150(citing Redd, 166 Wash. at 141, 6 P.2d 619). The dissent found that "[b]ecause the governing body is vested with the power to tax, it must either be directly accountable to taxpayers or limited by sufficient procedural safeguards." Id. at 847, 6 P.2d 619. The governing board was not subject to direct election and taxpayers living in the library district could not recall or vote out of office board members who were not from the district. See id. at 847-48, 6 P.2d 619.
¶ 53 The Monorail MVET does not satisfy these constitutional requirements. The Monorail Board is not directly elected by the citizens of Seattle, nor do sufficient procedural safeguards control its use of taxing power. The majority of appointed members do not hold elected positions.
¶ 54 The majority points to possible safeguards against abuse in holding that this MVET is constitutional. See majority at 897. Such safeguards cannot overcome the constitutional defect in placing tax setting power in the hands of board members who are neither directly elected by the people nor comprised of elected officials. "No viable alternative means for holding SMP [Monorail] Board members accountable for their tax related actions actually exists," resulting in a scenario where "board members are left primarily to police themselves." Matthew Senechal, Revisiting Granite Falls: Why the Seattle Monorail Project Requires Re-examination of Washington's Prohibition on Taxation without Representation, 29 SEATTLE U.L.REV. 63, 91 (2005). With only two of the Monorail Board's nine members elected by voters,[5] it cannot reasonably be held to represent *903 or to be directly accountable to the people it taxes.

B. Whether MVET is an Excise Tax

¶ 55 The majority in Sheehan v. Central Puget Sound Regional Transit Authority, 155 Wash.2d 790, 123 P.3d 88 (2005) held that the Monorail's MVET was an excise tax and not a property tax. Today's majority opinion provides scant analysis or reasoning for the same conclusion beyond citation to Sheehan. As pointed out by the dissent in Sheehan, there was good reason to remand for further proceedings to determine whether the Monorail MVET is actually a property tax because it is imposed on ownership of a vehicle. Sheehan, 155 Wash.2d at 814-17, 123 P.3d 88 (J.M. Johnson, J., dissenting).[6] Recent events indicate there is little practical purpose for remanding this case for further proceedings. There is surely not a sufficient record for definitively concluding that the Monorail MVET is a valid excise tax. The record is to the contrary.
¶ 56 This court's jurisprudence has always narrowly construed the legislature's taxing power[7] and has likewise denied even legislative grant of taxing authority to a municipality wherever there is any doubt of the breadth or existence of such a grant.[8] The dissent in Sheehan makes the plain observation that the statutory grant of legislative taxing authority to the Monorail is devoid of any language indicating that it can be levied annually. See Sheehan, 155 Wash.2d at 810, 123 P.3d 88 (J.M. Johnson, J., dissenting). Our jurisprudence requires narrow construction of the grant of taxing authority.
¶ 57 As indicated in the Sheehan dissent, if the Monorail MVET is actually "ad valorem or property taxes mislabeled as `excise,'" we should not hesitate to say so and invalidate the taxes. Id. at 816, 123 P.3d 88.
¶ 58 I separately disagree with the majority's erroneous assertion that a sufficient nexus exists between the taxing event and Monorail because Seattle residents are the *904 prime beneficiaries. Majority at 898. Seattle voters ultimately concluded to the contrary. This observation still adds nothing to the analysis of whether MVET is an excise or ad valorem tax.

C. Improper Valuation Schedule

¶ 59 Also improper is Monorail's continued use of the twice-repealed MSRP.[9] The MSRP valuation schedule was most recently repealed by Washington State voters in November 2002. This was the same election in which Seattle voters approved Seattle Citizen Petition No. 1. The concurrent repeal of the MSRP valuation schedule should therefore have informed our reading of the meaning of the term "value" in Seattle Popular Monorail Authority Proposition No. 1.
¶ 60 Here, the trial court clearly was in error in concluding that the voters approving Seattle Citizen Petition No. 1 would have thought "value" meant the MSRP valuation schedule that was repealed in the same election. In its natural and ordinary sense, "value" connotes fair market value.[10] A voter or motor vehicle owner would in all likelihood consider the value of his motor vehicle to be its sale price in the marketplace.
¶ 61 Further, the Monorail's publications cited the market value of various automobiles in describing how the MVET tax would be implemented. See Clerk's Papers (CP) at 444-45. In the agreed stipulation of facts at the trial court, Monorail and the State conceded that "The Elevated Transportation Company led voters to believe that SPMA [Monorail] MVET would be assessed on the market value of the taxed vehicle." CP at 1044 (emphasis added). All of this evidence supports only the conclusion that the MVET tax was understood by voters as based upon the fair market value of motor vehicles.
¶ 62 The majority's arguments defending continued usage of the MSRP schedule are unpersuasive. It was conceded only that some mass appraisal methodology may be appropriate, rather than individual appraisals. Appellants' Replacement Br. at 54. The majority overlooks the fact that the record includes several accepted mass appraisal methodologies that more closely reflect the actual market value of motor vehicles. In the agreed stipulation of facts, Monorail and the State conceded that "Several publicly accepted commercial data bases provide the market value of used cars including Kelley Blue Book, Edmunds.com, and the National Automobile Dealers Association (NADA)." CP at 1043.[11]
¶ 63 Accordingly, I disagree with the majority's upholding the use of the MSRP and would hold that Monorail must use a valuation methodology, such as those in the agreed stipulation of facts, which approximates the fair market value of motor vehicles.

HAPPY ENDING; THE VOTERS EXERCISE THEIR POWER OVER MONORAIL
¶ 64 By today's decision, the majority would allow an unelected agency board to bind future generations of people to pay improper taxes. The court missed an opportunity to uphold the fundamental constitutional principle of no taxation without representation. The court also validated a tax valuation schedule that the people had twice rejected. The court has again failed to assure constitutional *905 constraints apply to this abusive agency.[12]
¶ 65 This is a political story with a happy and constitutional  ending, however. In November 2005 Seattle voters exercised their rights and voted against Seattle Popular Monorail Authority Proposition No. 1, which terminated the Monorail. I defer to them, and dissent from the majority's decision today.
SANDERS, J., concurs.
NOTES
[1] Appellants filed an amicus brief in Sheehan.
[2] RCW 35.95A.030(1) provides that in creating a city transportation authority the ordinance or petition submitted to the voters in the relevant city must, among other requirements, "[p]ropose the authority area and the size and method of selection of the governing body of the authority, which governing body may be appointed or elected."
[3] The objective of article XI, section 12, frequently called the "home-rule provision," restricting direct legislative action as to local taxing matters, was to bar the state legislators, whose members come from all parts of the state, from dictating local taxing policy and instead to allow municipalities to control local taxation for local purposes. See, e.g., Schneidmiller & Faires, Inc. v. Farr, 56 Wash.2d 891, 894-96, 355 P.2d 824 (1960); Alfred Harsch, The Washington Tax System-How it Grew, 39 WASH. LAW REV. 944, 950-51 (1964); Philip A. Trautman, Legislative Control of Municipal Corporations in Washington, 38 WASH. LAW REV. 743, 754-55 (1963) (under article XI, section 12, the state legislature is constitutionally precluded from acting in such instances as the imposition of taxes for building city halls, erecting and operating light plants or gas works, constructing sewers, and bringing water to a city; the legislature may authorize certain acts and then allow the municipality to decide whether or not to act and thus whether or not to tax, such cases include authorization of drainage districts and local improvement districts).
[4] Article VII, section 9, similar to article XI, section 12, allows the legislature to delegate taxing power to all municipal corporations (e.g., cities, towns, counties, special diking districts, and other local municipal corporations). See, e.g., Hansen v. Hammer, 15 Wash. 315, 46 P. 332 (1896).
[5] Furthermore, the MVET will be collected by the Department of Licensing, imposed at the same time and in the same manner as relicensing tab fees, with valuation consistent with chapter 82.44 RCW. RCW 35.95A.130. The city transportation authority may be dissolved by the voters if the authority is faced with significant financial problems. RCW 35.95A.120. The authority is required to establish necessary and appropriate funds and accounts consistent with the uniform system of accounts developed pursuant to RCW 43.09.210. RCW 35.95A.060. Before utilization of any excise tax money collected, the legislature requires the authority to adopt rules affording the public an opportunity for public hearings. RCW 35.95A.080. The amount of the authority's initial bond issue is limited to the amount of the project costs in the subsequent two years as documented by a certified engineer or by submitted bids, plus any reimbursable capital expenses already incurred at the time of the bond issue. RCW 35.95A.120.
[6] As discussed in Sheehan, a motor vehicle excise tax has been imposed since 1937. Prior to 1990, each year administrative staff of the Department of Licensing prepared and printed valuation schedules for motor vehicles based on motor vehicles' model and year. See, e.g., CP at 76-80. In 1990, the Department of Licensing adopted a statutory depreciation schedule. See, e.g., CP at 64. Under this schedule, the amount of the MVET levied is a function of the manufacturer's suggested retail price (MSRP), excluding optional equipment, based on the number of years the vehicle has been in service. See, e.g., CP at 64. This new schedule requires less administrative staffing and cost and was revenue neutral when adopted in 1990. See, e.g., CP at 80.
[7] We recognize that a recent vote by the people may have ended Seattle's monorail project. However, because vehicle owners may still be required to pay the MVET to retire the debt incurred by the project, the issues in this case remain relevant.
[1] In Washington, the people retain legislative powers. See WASH. CONST. art. II, § 1.
[2] See McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 428, 4 L.Ed. 579 (1819) ("The only security against the abuse of this power [of taxing the people and their property], is found in the structure of government itself. In imposing a tax, the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation"); Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 115, 21 L.Ed. 394 (1872) (Bradley, J., dissenting) (Referring to the fundamentals of the constitution in the Colonies and its regarding "taxation without representation as subversive of free government, was the origin of our own revolution.").
[3] See THE DECLARATION OF INDEPENDENCE (U.S.1776); U.S. Const. art IV, § 4. ("The United States shall guarantee to every state of this union a republican form of government. . . ."); Enabling Act, ch. 180, § 8, 25 Stat. 679 (1889) (declaring that with the final act of compliance, the State "shall be deemed admitted by Congress into the Union ... on an equal footing with the original States"); Romine v. State, 7 Wash. 215, 218, 34 P. 924 (1893) (describing a state's enabling act as a proposition to the people, the conditions for which, upon adoption of a state constitution and admission to the union, become binding upon the state). See also John C. Eastman, "The Declaration of Independence as Viewed from the States," in THE DECLARATION OF INDEPENDENCE: ORIGINS AND IMPACT (Scott Douglas Gerber ed., 2002).
[4] See also New Orleans Waterworks Co. v. La. Sugar Ref. Co., 125 U.S. 18, 31, 8 S.Ct. 741, 31 L.Ed. 607 (1888) ("[T]he power of determining what persons and property shall be taxed belongs exclusively to the legislative branch of the government, and, whether exercised by the legislature itself, or delegated by it to a municipal corporation, is strictly a legislative power"); Meriwether v. Garrett, 102 U.S. (12 Otto) 472, 515, 26 L.Ed. 197 (1880) ("[Taxation] is a high act of sovereignty, to be performed only by the legislature upon considerations of policy, necessity, and the public welfare. In the distribution of the powers of government in this country into three departments, the power of taxation falls to the legislative.").
[5] Pursuant to Seattle Citizen Petition No. 1, § 4(g), the Monorail Board was charged with submitting a proposal to Seattle voters that would make a mere majority of the board seats elected by Seattle voters. Monorail submitted to the voters of Seattle a proposition (Proposition No. 2) for the November 2005 election that would make five of the Monorail Board positions elected, beginning with the 2007 general municipal elections in Seattle. The remaining four positions would be appointive. Proposition No. 2 passed, but will not be carried into effect because in the same election the voters of Seattle voted against Proposition No. 1, which dissolves the Monorail authority. See infra, note 12. The passage of Proposition No. 2 does not cure the constitutional defects outlined infra. The majority's decision should not have the prospective effect of encouraging subsequent creation of unconstitutional taxing power in municipal corporations.
[6] The nature of a tax is not determined by the label. Sheehan, 155 Wash.2d at 814, 123 P.3d 88 (J.M. Johnson, J., dissenting). Rather, "`[t]he character of a tax is determined by its incidents, not by its name.'" Harbour Vill. Apts. v. City of Mukilteo, 139 Wash.2d 604, 607, 989 P.2d 542 (1999) (quoting Jensen v. Henneford, 185 Wash. 209, 217, 53 P.2d 607 (1936)). The basis for levying is not solely determinative, e.g., whether it is calculated with reference to the value of property, "it may be a property tax." High Tide Seafoods v. State, 106 Wash.2d 695, 699, 725 P.2d 411 (1986) (emphasis added). The key to identifying a property tax is whether the tax is triggered by the simple fact of property ownership, creating an "`element of absolute and unavoidable demand.'" Harbour Vill., 139 Wash.2d at 611, 989 P.2d 542 (Talmadge, J., dissenting) (quoting Black v. State, 67 Wash.2d 97, 99, 406 P.2d 761 (1965)). A tax is an excise where "(1) the obligation to pay ... is based upon the voluntary action of the person taxed in performing the act, enjoying the privilege, or engaging in the occupation ... [subject to the tax] and (2) the element of absolute and unavoidable demand is lacking." Arborwood Idaho, L.L.C. v. City of Kennewick, 151 Wash.2d 359, 367, 89 P.3d 217 (2004) (citing Covell v. City of Seattle, 127 Wash.2d 874, 889, 905 P.2d 324 (1995); High Tide Seafoods, 106 Wash.2d at 699, 725 P.2d 411).
[7] "It is elementary that the power of taxation, subject to constitutional limitations, rests solely in the legislature. Municipal corporations have no inherent power to levy taxes. Their powers are derived through legislative grant, and are strictly construed. No implications are indulged to expand the powers granted." Kelly, 176 Wash. at 690, 30 P.2d 638 (emphasis added). Accord Covell, 127 Wash.2d at 879, 905 P.2d 324; Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 854 P.2d 23 (1993).
[8] "If there is any doubt about a legislative grant of taxing authority to a municipality, it must be denied." Okeson v. City of Seattle, 150 Wash.2d 540, 558, 78 P.3d 1279 (2003) (citing Pac. First Fed. Sav. & Loan Ass'n v. Pierce County, 27 Wash.2d 347, 353, 178 P.2d 351 (1947)). Accord Arborwood, 151 Wash.2d at 374-75, 89 P.3d 217.
[9] DOL stopped collecting MVET in 2000 because it was repealed by I-695. DOL's table was only put back into use following this court's decision in Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 11 P.3d 762 (2000). It was repealed again by I-776. The second repeal was enjoined pending this court's resolution of the legal challenge to I-776. See Pierce County v. State, 150 Wash.2d 422, 78 P.3d 640 (2003).
[10] Where the language of an initiative enactment is "`plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation.'" Amalgamated, 142 Wash.2d at 205, 11 P.3d 762(quoting State v. Thorne, 129 Wash.2d 736, 762-63, 921 P.2d 514 (1996)). "However, if there is ambiguity in the enactment, the court may examine the statements in the voters pamphlet in order to determine the voters' intent." Id. at 205-06, 11 P.3d 762 (citing Thorne, 129 Wash.2d at 763, 921 P.2d 514). See Biggs v. Vail, 119 Wash.2d 129, 134, 830 P.2d 350 (1992) (if there is ambiguity, extrinsic aids, such as legislative history, may be used to determine legislative intent).
[11] These "Blue Books" are frequently used for loan purposes.
[12] In HTK Management, L.L.C. v. Seattle Popular Monorail Authority, 155 Wash.2d 612, 121 P.3d 1166 (2005), this court also approved the unconstitutional taking of property in Pioneer Square by Monorail.