[No. 31195-3-III. Division Three. May 20, 2014.]

THE CITY OF WENATCHEE, *Appellant*, v. CHELAN COUNTY PUBLIC UTILITY DISTRICT NO. 1, *Respondent*.

*Steve D. Smith* and *Aaron J. Harris* (of *Johnson, Gaukroger, Drewelow & Woolett PS*), for appellant.

*Carol A. Wardell* (of *Chelan County Public Utility District*), for respondent.

*Andrew W. Maron* on behalf of Washington Association of Sewer and Water Districts and Shoreline Water District, amici curiae.

*Michael M. Hanis* on behalf of Soos Creek Water and Sewer District, amicus curiae.

¶1 SIDDOWAY, C.J. — This case calls on us to decide whether one municipality may tax the revenue of another municipality based on a general rather than specific legislative grant of taxing authority, where the revenue is from activity that is proprietary in character rather than governmental. To decide that question, we must discern the principles on which this issue was decided by our Supreme Court in *King County v. City of Algona*, 101 Wn.2d 789, 681 P.2d 1281 (1984). In *Algona*, the city of Algona assessed a

business and occupation tax on revenues generated by a King County solid waste plant located in the city—a tax that the Supreme Court held was invalid.

¶2 Considering the decision in *Algona* in its entirety and bearing in mind the language of the Washington Constitution and earlier and later decisions by our Supreme Court, we hold that *Algona* was decided on the basis of the governmental character of the activity that the city of Algona sought to tax. Because the utility tax that the city of Wenatchee levied in this case was on activities that were proprietary (in whole or in large part), we hold that the city enjoys the authority to levy and collect the tax from Chelan County Public Utility District No. 1, except to the extent that the district can demonstrate that its revenues were derived from governmental activities. We therefore reverse the trial court's declaratory judgment in favor of the district and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶3 In April 1964, the city of Wenatchee adopted a utility tax on domestic water sales. Chelan County Public Utility District No. 1 (PUD), which provides water to 2,000 customers located within the city's limits, paid the utility tax on domestic water service for many decades. In May 2012, however, it notified the city of its intent to stop paying the tax on its water system revenues, having concluded that absent express statutory authorization to the city to impose the tax the PUD enjoyed immunity from taxation under the governmental immunity doctrine. By express authorization, the PUD means legislation that not only authorizes a municipality to tax but explicitly authorizes it to tax other municipalities. The PUD is itself a municipal corporation authorized to own and operate domestic water systems and to sell electric power. *See* ch. 54.04 RCW.

¶4 The city and the PUD presented their disagreement over the city's authority to tax to the Chelan County Supe-

*rior* Court through a declaratory judgment action by the city, in which the PUD joined. No facts are in dispute.

¶5 The city's position is that RCW 35A.82.020, which grants code cities like Wenatchee broad general authority to impose excise taxes for regulation or revenue, includes the authority to tax domestic water sales by another municipality that take place within the city limits. Its position is that the governmental immunity doctrine applies only when the municipality being taxed is operating in a sovereign capacity; in that case (and only that case) it agrees that the legislative authorization to tax that governmental function must be express in the sense urged by the PUD. Where a municipality is operating in a proprietary capacity—as the PUD is, in selling domestic water—the city contends that the governmental immunity doctrine does not apply and the legislature's general grant of authority to impose an excise tax is sufficient.

¶6 The PUD's position is that the governmental immunity doctrine applies any time one municipality seeks to tax another, so that express legislative authorization to tax another municipality is always required. It views governmental immunity as grounded in article VII, section 9 and article XI, section 12 of the Washington Constitution.

¶7 The trial court was persuaded by the arguments of the PUD, declared the utility tax imposed by the city on the PUD's water system to be unlawful, and ordered the city to cease charging the PUD for the tax. The city appeals.

## ANALYSIS

¶8 Central to the parties' disagreement and to our task on appeal is determining the principle of law expressed in *Algona* that constituted the holding of that case. The disposition reached by the Washington Supreme Court in *Algona* was that the city of Algona lacked authority to assess a business and occupation (B&O) tax against King County on revenues from a solid waste plant owned by the

county that was located in the city. The parties point to different statements of legal principle in *Algona* as accounting for that disposition.

¶9 The PUD argues that the *Algona* court expressed the principle of law necessary to its disposition when it said:

> The general grant of taxation power on which Algona relies in RCW 35A.11.020 contains no *express* authority to levy a tax on the State or another municipality. To allow [Algona] to impose the tax in this case would violate the established rule that municipalities must have specific legislative authority to levy a particular tax.
>
> The governmental immunity doctrine provides that one municipality may not impose a tax on another without express statutory authorization.

101 Wn.2d at 793 (citations omitted).

¶10 The city argues that the foregoing discussion in *Algona* cannot be read in isolation and that it was implicitly based on the fact that Algona was seeking to tax revenue derived from a governmental function. It argues that the court more clearly expressed the principle of law necessary to its disposition when it said:

> [Algona] argues that governmental immunity should not apply because the [King] County operation of a solid waste transfer station is proprietary. This court has explicitly recognized that the disposal of solid waste is a governmental function. Where the primary purpose in operating the transfer station is public or governmental in nature, the county cannot be subject to the city B & O tax, absent express statutory authority.

*Id.* at 794 (citation omitted).

¶11 The city also points to *Burba v. City of Vancouver*, 113 Wn.2d 800, 783 P.2d 1056 (1989), in which the Supreme Court held that a city could constitutionally impose a utility tax on a city-owned water and sewer utility—although without addressing *Algona* or the doctrine of governmental immunity. It also points to *Burns v. City of Seattle*, 161

Wn.2d 129, 164 P.3d 475 (2007), in which the Supreme Court noted an asserted inconsistency between *Algona* and *Burba*. Without deciding what, precisely, *Algona* held, the *Burns* court observed that a city's ability to impose an excise tax on revenue of a utility "is not . . . a settled issue of law" and that "it is by no means certain . . . that the doctrine of governmental immunity from taxation would prevent the [cities of Shoreline, Burien, Lake Forest Park, SeaTac, and Tukwila] from imposing a utility tax on [Seattle City Light]." *Id.* at 159-60.

¶12 For reasons explained below, we conclude, first, that the provisions of the Washington Constitution relied on by the PUD are not a source of limitation on local taxing authority granted by the legislature; second, that RCW 35A.82.020's grant of taxing authority is broad and, on its face, sufficient to support a municipality's taxation of another municipality's conduct of activity within its borders; and third, that the legislature's use of more explicit language in statutes dealing with a city's taxation of a public utility district's sale of electricity does not support the conclusion that we should ignore the plain language of RCW 35A.82.020 in favor of a more narrow authorization.

¶13 Turning to the governmental immunity doctrine, we recognize that it is a common law doctrine implied where a government acts in its sovereign capacity. We conclude that *Algona*'s holding is consistent and limits immunity from taxation to sovereign, not proprietary, activities. Finally, we acknowledge the PUD's and amici's argument that recent case law and legislation may support a water purveyor's claim that it has allocated and recovered the cost of providing fire suppression services and that its revenue from those fees is from a government function. Since the record is insufficient to determine what, if any, revenues of the PUD might be immune from taxation on that basis, that issue must be resolved upon remand to the trial court.

334

## I. Article XI, section 12 and article VII, section 9 of the Washington Constitution are not a source of limitation on local taxing authority granted by the legislature

 ¶14 Article XI of the Washington Constitution, dealing with "County, City, and Township Organization," provides at its section 12 (entitled "Assessment and Collection of Taxes in Municipalities"):

The legislature shall have no power to impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof, the power to assess and collect taxes for such purposes.

¶15 The general import of this section of the Washington Constitution is well settled. In *Larson v. Seattle Popular Monorail Authority*, 156 Wn.2d 752, 758, 131 P.3d 892 (2006), our Supreme Court stated that the provision "clearly establishes that the state legislature may delegate to the corporate authorities of municipalities the power to tax such municipalities, their inhabitants, and property for local purposes," while at the same time "expressly prohibit[ing the legislature] from direct taxation of municipalities and their inhabitants and property for local purposes." The apparent objective of the provision, frequently called the "home rule provision," was "to bar the state legislators, whose members come from all parts of the state, from dictating local taxing policy and instead to allow municipalities to control local taxation for local purposes." *Id.* at 756 n.3; *Citizens for Financially Responsible Gov't v. City of Spokane*, 99 Wn.2d 339, 346, 662 P.2d 845 (1983) ("The focus of article 11, section 12 is to restrict the *State* from imposing taxes on municipal corporations or inhabitants or property therein, for municipal purposes.").

¶16 Article VII of the Washington Constitution, dealing with revenue and taxation, provides at its section 9 (entitled "Special Assessments or Taxation for Local Improvements"):

The legislature may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of property benefited. For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes and such taxes shall be uniform in respect to persons and property within the jurisdiction of the body levying the same.

"[S]imilar to article XI, section 12, [article VII, section 9] allows the legislature to delegate taxing power to all municipal corporations." *Larson*, 156 Wn.2d at 757 n.4.

¶17 Both of these constitutional provisions "are permissive in character and clearly show that municipal corporations are without any inherent power of taxation, being dependent on legislative grant for their enjoyment of such power. The legislature may give such authority or it may withhold it." Alfred Harsch, *The Washington Tax System— How It Grew*, 39 WASH. L. REV. 944, 950 (1965).

¶18 In *Larson*, the Supreme Court rejected a taxpayer argument that the Washington Constitution—and these two provisions, in particular—could be read to limit a legislative delegation of local taxing authority to only those municipalities whose governing board members are elected, not appointed. Noting that the taxpayers were unable to point to language in the Washington Constitution that supported their position, the Supreme Court cited the controlling principles of constitutional construction under which any effort to "engraft" language onto the state constitution fails. As a general rule when interpreting constitutional provisions, "we look first to the plain language of the text and will accord it its reasonable interpretation." *Larson*, 156 Wn.2d at 757-58 (citing *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151 Wn.2d 470, 477, 90 P.3d 42 (2004)). If the text is clear, then no construction or interpretation is necessary. *Id.* at 758 (citing *Wash. Water Jet Workers Ass'n v. Yarbrough*, 148 Wn.2d 403, 431, 61 P.3d

309 (2003) (Bridge, J., dissenting)). In addition, "[a] party challenging a statute's constitutionality bears the heavy burden of establishing its unconstitutionality," which is met only "if argument and research show that there is no reasonable doubt that the statute violates the constitution." *Id.* at 757 (citing *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2000)).

¶19 These same principles require rejection of the PUD's argument that articles VII and XI of the Washington Constitution limit the legislature's power to delegate to municipalities the power to tax other municipalities. The PUD cannot point to any language in these constitutional provisions that imposes such a limitation. By contrast, a different provision of the constitution (article VII, section 1) exempts the property of municipalities from taxation, demonstrating that when the framers wished to provide local governments with constitutional protection from taxation, they did.

¶20 Articles VII or XI of the Washington Constitution cannot be read to limit the legislature's power to authorize municipal-on-municipal taxation.

## II. RCW 35A.82.020's grant of taxing authority is broad and, on its face, sufficient to support one municipality's taxation of another government's conduct of activity within its borders

¶21 For authority to impose its utility tax, the city relies on RCW 35A.82.020. It was adopted in 1967 and grants code cities the authority, among other matters, to levy a B&O tax. *Algona*, 101 Wn.2d at 792. In relevant part, it provides that code cities

> may exercise the authority authorized by general law for any class of city . . . to impose excises for regulation or revenue in regard to all places and kinds of business, production, commerce, entertainment, exhibition, and upon all occupations, trades and professions and any other lawful activity.

RCW 35A.82.020.

¶22 Our fundamental objective in interpreting a statute is to ascertain and carry out the legislature's intent. *Arborwood Idaho, LLC v. City of Kennewick*, 151 Wn.2d 359, 367, 89 P.3d 217 (2004). If the statute's meaning is plain on its face, then we must give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). A tax statute must be construed as a whole to ascertain the intent of the legislature. *Grp. Health Coop. of Puget Sound, Inc. v. Dep't of Revenue*, 106 Wn.2d 391, 401, 722 P.2d 787 (1986).

¶23 When it comes to statutes dealing with taxation, legislative power is particularly broad and it is inherent in the exercise of the power that the State, or here, its delegee, within the scope of its delegation, be free to select the objects or subjects of taxation. *Commonwealth Title Ins. Co. v. City of Tacoma*, 81 Wn.2d 391, 394-95, 502 P.2d 1024 (1972). In construing RCW 35A.82.020 in particular, our Supreme Court has held that, like the taxing authority of other classes of city, the licensing and taxing power granted by the statute is "liberally construed to carry out the objectives" of the cities of the first class. *Harbour Vill. Apts. v. City of Mukilteo*, 139 Wn.2d 604, 618 n.9, 989 P.2d 542 (1999) (Talmadge, J., dissenting) (citing ch. 35.22 RCW; *Citizens*, 99 Wn.2d at 343-44); RCW 35A.01.010 (stating that "[a]ll grants of municipal power to municipalities electing to be governed under the provisions of this title, whether the grant is in specific terms or in general terms, shall be liberally construed in favor of the municipality"). Nonetheless, if a tax statute is ambiguous, it must be construed most strongly against the taxing authority. *Grp. Health*, 106 Wn.2d at 401.

¶24 There is no ambiguity in the statute's grant to code cities of the authority to impose excises for revenue "in regard to all . . . kinds of business . . . and any other lawful activity." The legislature may authorize a municipality to

engage in business, and when it does, the municipality "may exercise its business powers in very much the same way as a private individual." *Okeson v. City of Seattle*, 150 Wn.2d 540, 549-50, 78 P.3d 1279 (2003). In acting in a proprietary capacity, " 'a municipal corporation acts as the proprietor of a business.' " *Burns*, 161 Wn.2d at 155 (quoting *Hite v. Pub. Util. Dist. No. 2 of Grant County*, 112 Wn.2d 456, 459, 772 P.2d 481 (1989)). In the erection and operation of waterworks and the like, a municipal corporation acts as a business concern. *Id.*

■■■ ¶25 In light of the statute's grant of authority to municipalities to tax "all . . . kinds of business" and the legislature's directive that all grants of authority in Title 35A RCW, whether specific or general, be liberally construed in favor of the municipality, RCW 35A.82.020's grant of authority is unambiguously broad enough to support the city of Wenatchee's taxation of the PUD's conduct of business within its borders.

III. The legislature's use of more explicit language
regulating taxation of electricity in
RCW 54.28.070 does not support
ignoring the plain language
of RCW 35A.82.020

■■■ ¶26 Despite the breadth of the legislature's grant of B&O taxing authority to municipalities, both the PUD and amici point to the fact that a different statute, RCW 54-.28.070, more explicitly authorizes taxation of public utility districts by cities. It provides that a city in which a public utility district operates works, plants, or facilities for the distribution and sale of electricity

> shall have the power to levy and collect from such district a tax on the gross revenues derived by such district from the sale of electricity within the city or town, exclusive of the revenues derived from the sale of electricity for purposes of resale,

and that the district shall have the power, in turn, to "add the amount of such tax to the rates or charges it makes for

electricity so sold within the limits of such city or town." RCW 54.28.070. From this, they argue that this degree of specificity is required any time the legislature authorizes one local government to levy taxes against another.

¶27 Chapter 54.28 RCW, including RCW 54.28.070, was initially enacted in 1941. Among other things, it imposes a privilege tax on revenues from the generation, distribution, and sale of electric energy that the Washington State Department of Revenue collects from public utility districts and then shares with counties in which the public utility districts operate. The state tax is imposed on the gross revenue from the sale of electric energy, excluding any tax levied on the public utility district by a municipality. RCW 54.28.011. Read as a whole, chapter 54.28 RCW imposes a regulatory scheme controlling the different tax burdens to which public utility districts providing electrical service are subjected, denies municipalities the authority to tax sales of electricity for resale, and addresses how the municipal tax burden is taken into consideration in calculating the gross revenues taxed by the State.

¶28 It was a little over 25 years after the legislature enacted RCW 54.28.070 that it enacted RCW 35A.82.020, granting cities the broad local B&O taxation authority relied on by the city of Wenatchee. Had chapter 54.28 RCW been a pure delegation of taxation authority, as RCW 35A.82.020 is, the PUD could reasonably argue that we should read the two statutes alongside one another and attempt to harmonize them. But unlike the legislature's delegation of local B&O taxing authority, chapter 54.28 RCW has multiple regulatory objectives: not only what cities can tax but what they cannot, and the fact that the municipal taxes may be passed through and, if they are, will be excluded in determining gross revenue for state taxation. Given this marked difference between the objects of the provisions, it is unsurprising that RCW 35A.82.020 does not make any explicit provision for taxing business when it is being carried on by a municipality. Unlike RCW 54.28-.070, it does not need to.

¶29 The existence of a differently framed statute addressed to different objects and purposes is not relevant to our construction of the legislature's grant of local B&O taxing authority.

### IV. The governmental immunity doctrine is an implied doctrine that applies only where one municipality seeks to tax the governmental functions of another

¶30 We turn, now, to the governmental immunity doctrine, a long standing implied limitation on government-on-government taxation.

¶31 Well before the framing of the Washington Constitution in 1889, the roles of different sovereigns in a constitutional scheme had been recognized as giving rise to implied immunity from another government's taxation. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819) struck down a tax that the State of Maryland had imposed on a branch of the Bank of the United States, a federal instrumentality. Having concluded that the bank had been constitutionally created, and recognizing that the power to tax was the "power to destroy," the Court held that the States lacked power, "by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *Id.* at 431, 436.

¶32 A half century later but still before Washington statehood, the United States Supreme Court held that "the immunity that federal instrumentalities and employees . . . enjoyed from state taxation, was to some extent reciprocal" and that "the existence of the *States* implies some restriction on the *national taxing power*." *Massachusetts v. United States*, 435 U.S. 444, 454, 98 S. Ct. 1153, 55 L. Ed. 2d 403 (1978) (emphasis added) (citations omitted) (speaking of *Collector v. Day*, 78 U.S. (11 Wall.) 113, 20 L. Ed. 122 (1871)). "The immunity of the Federal Government from state

taxation is bottomed on the Supremacy Clause, but the States' immunity from federal taxes was judicially implied from the States' role in the constitutional scheme." *Id.*

¶33 The contours of the States' immunity implied from federal taxation waxed and waned after *Day*, with some opinions speaking of only "governmental" activity being immune from taxation, not "proprietary" activity. *See id.* at 457. Later decisions focused on whether the federal government was imposing a nondiscriminatory tax on an activity that the government had traditionally taxed. *See, e.g., New York v. United States*, 326 U.S. 572, 584, 66 S. Ct. 310, 90 L. Ed. 326 (1946) (finding no restriction on Congress "to include the States in levying a tax exacted equally from private persons upon the same subject matter"). While the States' implied immunity from federal taxation no longer turns on a governmental/proprietary distinction, it turns on a similar concept; as explained in *Massachusetts*, the purpose of the implied constitutional restriction on the national taxing power is not to give the States an advantage over private entities, "but rather is solely to protect the States from undue interference with their traditional governmental functions." 435 U.S. at 459.

¶34 We agree with the city of Wenatchee that governmental immunity in Washington is, like governmental immunity between the federal and state governments, an implied immunity—and on the intrastate level, is one aspect of the general doctrine of sovereign immunity. *See Murray v. State*, 62 Wn.2d 619, 384 P.2d 337 (1963) (discussing governmental tax immunity in sovereign immunity terms).

¶35 In *Algona*, the Washington Supreme Court recognized that the majority of jurisdictions adhere to the governmental immunity doctrine "on the theory that a local tax imposed on a political subdivision such as a county is tantamount to a tax imposed on the State." 101 Wn.2d at 794. More recently, our Supreme Court observed that in determining whether an action is sovereign or proprietary,

we may look not only to constitutional or statutory provisions indicating the sovereign nature of the power but may also consider "traditional notions of powers that are inherent in the sovereign." *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 165 Wn.2d 679, 687, 202 P.3d 924 (2009).

¶36 "The principal test for determining whether a municipal act involves a sovereign or proprietary function is whether the act is for the common good or whether it is for the specific benefit or profit of the corporate entity." *Id.* (citing *Okeson*, 150 Wn.2d at 550). In the context of utilities, the focus is on whether the utility "operates for the benefit of its customers, not the general public" or, stated differently, whether it "will [provide service] to a customer that does not request service." *Okeson*, 150 Wn.2d at 550. If it operates to serve customers, a utility is serving a proprietary function. *See id.*

¶37 Washington decisions have held that the operation of a water system or other utility serving billed customers is a proprietary function. *Russell v. City of Grandview*, 39 Wn.2d 551, 553, 236 P.2d 1061 (1951) (citing prior Washington decisions for the proposition that "a city engaged in [operating a water system] acts in its proprietary capacity"); *Pub. Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 227-28, 228 P.2d 766 (1951) (in the " 'erection and operation of . . . waterworks and the like . . . a municipal corporation acts as a business concern' " (quoting 1 OSCAR L. POND, A TREATISE ON THE LAW OF PUBLIC UTILITIES § 5, at 15 (4th ed. 1932))); *City of Moses Lake v. United States*, 430 F. Supp. 2d 1164, 1174 (E.D. Wash. 2006) (recognizing that "in Washington, operation of a municipal water system has not traditionally been considered a power or duty which inheres in the sovereign, but rather a proprietary activity for the advantage of each community").

¶38 The governmental immunity doctrine does not apply, then, to the PUD's proprietary delivery of water to its customers.[1]

V. Reasonably read, *Algona* is predicated on the governmental character of the activity being taxed and, when governmental immunity is implicated, a requirement that a legislative intent to tax sovereign activity must also be express

¶39 Two Washington cases, *City of Seattle v. State*, 59 Wn.2d 150, 367 P.2d 123 (1961) and *Algona*, establish that Washington adheres to the government immunity doctrine, but not as an absolute constitutional exemption from taxation: the legislature may tax or permit its agencies to tax even governmental activities of local governments. Because of the implied tax immunity for governmental activity, however, any intent to tax governmental activity must be express. Given the "express authorization" already required for *any* constitutional grant of taxing authority, discussed in Part I above, we will refer to the requirement for this

---

[1] Our concurring colleague is in good company in recognizing the imprecision of the governmental/proprietary distinction. *See, e.g., New York*, 326 U.S. at 583 (abandoning the distinction as "untenable" for purposes of determining immunity of state activities from federal taxation). It is nonetheless a distinction that Washington has continued to recognize. *See, e.g.*, RCW 4.96.010 (speaking of municipalities as "acting in a governmental or proprietary capacity," in waiving their sovereign immunity from liability for tortious conduct); *Okeson*, 150 Wn.2d at 549 ("A municipal corporation is generally considered to act in one of two capacities—a governmental capacity or a proprietary capacity.").

For the reasons we discuss in the body of the opinion, the courts' view of where water distribution falls on the governmental/proprietary divide may not matter, since it is ultimately for the legislature to decide whether to authorize municipal taxation of even governmental functions. Presumably the legislature is more concerned with whether utility taxes are an important and appropriate source of revenue needed by local governments for general municipal purposes than with whether we regard a public utility district's operation as governmental or proprietary. Surveys suggest that most Washington cities rely on a utility tax on water. *See, e.g.*, Ass'n of Wash. Cities, Tax and User Fee Survey: Executive Summary 4, 6 (2012) (reporting that of 231 responding cities and towns, representing 86 percent of the state's incorporated population, 166 imposed a utility tax on water utilities at a rate ranging from 1.46 percent to 36 percent, and averaging 9.3 percent), https://www.awcnet.org/Portals/0/Documents/Research/TUFS12web.pdf).

additional layer of express authorization imposed by *Seattle* and *Algona* as a requirement of express authorization overcoming implied governmental immunity.

¶40 To make clear the distinction, we examine two cases—*Citizens*, 99 Wn.2d 339, and *Hillis Homes, Inc. v. Snohomish County*, 97 Wn.2d 804, 650 P.2d 193 (1982)— that are cited in *Algona* and concern the constitutional requirement of express authorization that applies to any grant of taxing authority. In *Citizens*, the Supreme Court considered whether the legislature had granted authority to impose a local B&O tax to only the legislative authority of a municipality or more broadly to the municipality itself. The objects of the grant of authority became important when voters in the city of Spokane sought to repeal, by referendum, a B&O tax adopted by the city council. The city attorney had opined that the grant of taxing authority was exclusively to the city council and that petitions supporting the referendum to repeal should not be accepted for filing.

¶41 The Supreme Court began its analysis of local taxing authority by noting "[t]he general rule [that] municipalities possess, with respect to taxation, only such power as has been granted to them by the constitution or the general laws of the state." 99 Wn.2d at 343 (citing 16 Eugene McQuillin, The Law of Municipal Corporations § 44.05 (3d ed. 1981)). It found "clear legislative authority for cities to enact a [local B&O] tax such as that in [the city's] ordinance" and that in granting " '[a]ny city . . . power,' " the legislature had given authority to the city in general, not exclusively to the legislative body. *Id.* (quoting RCW 35.22-.280). The taxation by the city of another municipality was not an issue in the case and there was no discussion of governmental tax immunity, so the court's treatment of the need for "express authority" had nothing to do with governmental immunity.

¶42 *Hillis Homes* addressed a challenge to the authority of Snohomish and San Juan Counties to impose development fees. Both counties had adopted measures imposing

fees on new residential developments in response to financial difficulties precipitated by population growth in the counties. The counties argued that the assessments were fees rather than taxes and, alternatively, pointed for taxation authority to a statute allowing counties to condition subdivision approval on the availability of public facilities. At issue was whether the counties enjoyed the constitutionally required "express grant of authority to impose such taxes [from] the Legislature." 97 Wn.2d at 808. The court concluded that the required authority was lacking because the statute relied on authorized the counties only to condition subdivision approval on facilities, not to impose taxes to provide for such facilities. As in *Citizens*, the counties were not seeking to tax municipalities and governmental tax immunity was not an issue, so the discussion of "express authority" was unrelated to immunity.

¶43 The different and more explicit authority required to tax governmental activity was first raised in *Seattle v. State*. That case arose when, under protest, the city of Seattle paid B&O tax imposed by the State and brought an action for refund. Relevant here was its request for a refund of taxes that were imposed by the State on revenues derived from certain city park operations. The revenues helped defray costs, but park operations were not profitable, nor were they intended to be profitable. The city argued that the revenues, being from governmental rather than proprietary activities, were immune from taxation. While the B&O tax included "municipalities" within its definition of taxable "persons," the city argued that the legislature surely had not intended to tax a city's governmental activities.

¶44 The court disagreed. While much of its decision was addressed to whether revenues from "business" subject to the tax could be construed to include the intentionally unprofitable generation of revenue to defray expenses of a public park, the court eventually turned to the city's alternative claim of government immunity. As to that, the court said:

> It is unnecessary to consider whether the particular activities are governmental or proprietary in nature, since there is no language in the statute that makes such a distinction. As it is within the power of the legislature to tax governmental activities of a municipality, we cannot assume they have not done so by this enactment.

59 Wn.2d at 154. Several conclusions can be drawn from this terse analysis. First, and as earlier discussed, is that the source of government immunity is not grounded in the constitution, else the court would not say "it is within the power of the legislature to tax governmental activities of a municipality." Second, the court did not dismiss a governmental/proprietary distinction entirely, but only in light of the language of the statute under examination. Third, it appears key to the court's disposition that "municipalities" were explicitly included in the definition of "persons" subject to the tax and yet no exception was made for their governmental activities.

¶45 Before turning to *Algona*, we address one last case—a case that *Algona* overrules in part: *City of Bellevue v. Patterson*, 16 Wn. App. 386, 556 P.2d 944 (1976). In *Bellevue*, the Court of Appeals reviewed a writ of mandamus compelling the commissioners of a water district and a sewer district to comply with a B&O tax imposed by the city of Bellevue. Some customers of each district resided within the city's boundaries. The authority relied on for the city's B&O tax was RCW 35A.82.020, the same statute that the city of Wenatchee relies on in this case.

¶46 Similar to the PUD's argument here, the commissioners argued that the Washington Constitution required that "a legislative grant of the power to tax must specifically enumerate those to be subjected to the tax" and, since the legislature had not provided the basis for a tax "on sewer and water districts," the city of Bellevue lacked the power to impose the tax. *Id.* at 387. Significantly, the appellate court analyzed the district's position solely as a claim of exemption from tax. There was no discussion of

governmental immunity or the proprietary versus governmental activities in which municipal corporations such as the districts might engage. Thus analyzed, the *Bellevue* court held that "[t]he State may . . . choose to exempt certain businesses but such is not to be presumed by silence," that the burden of proving an exemption is on the person seeking the exemption, and, finally, that "[m]unicipal corporations as a class enjoy no exemption from taxation." *Id.* at 388. For the last proposition, it cited *Seattle*.

¶47 Eight years later, the Supreme Court decided *Algona*. It disposed of the case by agreeing with King County that its governmental activity of operating a solid waste plant within the city of Algona was immune from B&O tax. At issue in this case is its holding. Did the disposition turn on the governmental character of the activity and the doctrine of government immunity? Or was the court essentially agreeing with the position the districts had taken in *Bellevue*—that a legislative grant of authority to tax even proprietary activities of water and sewer districts must explicitly identify such districts as subject to the tax?

¶48 We conclude that the holding in *Algona* was the court's clear statement that "[w]here the primary purpose in operating the transfer station is public or governmental in nature, the county cannot be subject to the city B & O tax, absent express authority." 101 Wn.2d at 794. As authority for this statement, *Algona* cites *Salt River Project Agricultural Improvement & Power District v. City of Phoenix*, 129 Ariz. 398, 631 P.2d 553 (Ct. App. 1981), a case it cites elsewhere as the principal authority for the theory of governmental immunity to which the majority of jurisdictions subscribe. *See Algona*, 101 Wn.2d at 793-94.

¶49 *Salt River* held that while the city of Phoenix could impose an excise tax on the sale of water by another municipality—an agricultural improvement and power district—it could not tax payments for electricity at cost that the district received incident to a contract under which an

irrigation district assisted it in "accomplish[ing] the primary governmental purpose of each: drainage and irrigation." 631 P.2d at 557. While recognizing that "sales of water by cities to consumers are held to be proprietary business activities of the cities, rather than governmental acts," the court also recognized that an irrigation district "may act in a proprietary as well as a governmental capacity." *Id.* at 555. In citing repeatedly to *Salt River*, the *Algona* court surely understood and subscribed to its reasoning that the proprietary activities of a municipality, like the business activities of private parties, are subject to taxation.

¶50 This holding that only governmental activities are immune from taxation is consistent with *Algona*'s partial overruling of *Bellevue*. As the *Algona* court recognized, the court in *Bellevue* "analyzed the issue presented only in terms of *exemptions* from taxation. The issue of municipal corporation immunity from such a tax was never raised." 101 Wn.2d at 792-93. Given its different focus, *Bellevue* implied that a municipality was always subject to a general tax encompassing its activities. Taking into consideration the doctrine of governmental immunity, *Algona* held that if the activities being taxed were governmental rather than proprietary, then a more explicit authorization—overcoming the immunity that would otherwise be implied—was necessary. *Algona* therefore understandably overruled *Bellevue* "as to its provisions that are inconsistent with this opinion." *Id.* at 795.

¶51 We will grant that the rationale for the decision in *Algona* would be more clear if the decision had talked about the governmental (as opposed to proprietary) function presented by solid waste disposal before stating a number of principles limiting taxation of municipalities. Because it does not, the PUD argues that the court's statements about the limits on Algona's ability to tax King County's activities apply broadly to limit taxation of *any* municipal activity, proprietary or governmental.

¶52 We would point out, however, that when the court finally does reach the governmental/proprietary distinction

late in the opinion, it does so in a way that suggests that its analysis up to that point was all predicated on the governmental character of solid waste disposal. The court turns to the proprietary/sovereign function distinction not to address the county's contention that its activity was governmental but instead to address, and reject, the city's contention "that governmental immunity should not apply because the County operation of a solid waste transfer station is proprietary." *Id.* at 794.

¶53 The decision in *Algona* would also have been clearer if the court's discussion of the need for "express authorization" had made the distinction that, with the benefit of hindsight, we have made here: when governmental immunity is implicated, a two-layered express authorization is needed. Not only must the legislature provide an express grant of general taxing authority but, if it intends to tax governmental functions of a municipality, there must be an additional expressed intention overcoming what would otherwise be the implied immunity from tax of those functions.

¶54 In this case, the city of Wenatchee imposed B&O tax on the PUD's sale of domestic water. Because a municipality engaged in selling water acts in its proprietary capacity, the trial court erred in concluding that the PUD was immune from taxation.

## VI. Additional concerns of the PUD and amici

¶55 The PUD and amici express the concern that our decision in this case will have wide-ranging implications for other public utility districts and for water-sewer districts, and that interlocal agreements are a superior method for addressing taxation of sales of domestic water. Our role is to decide the issue presented for decision by the parties before us based on existing law. Any argument that the law should be changed should be addressed to the legislature.

¶56 The PUD and amici also argue that water purveyors engage in a governmental function to the extent they pro-

vide fire hydrants for fire protection purposes. They point to *Lane v. City of Seattle*, 164 Wn.2d 875, 194 P.3d 977 (2008), in which the Washington Supreme Court held that a city's activity of providing fire protection is governmental; that collection of the associated costs from water system users through a hydrant fee is a tax, not a regulatory fee; that, if adopted as a tax, the city can impose a tax to finance its fire hydrant system; and that where a city, by ordinance, requires a utility to provide hydrant service, then under the state accountancy statute, RCW 43.09.210, it must pay the utility for the service. They point to *City of Tacoma v. City of Bonney Lake*, 173 Wn.2d 584, 269 P.3d 1017 (2012), in which the court held that a municipality can oblige itself to provide a hydrant system to another municipality under a franchise agreement and acts in its proprietary capacity in doing so; that where it freely contracts to provide the service, it may not charge for the service under the accountancy statute; and that a charge for hydrants is not necessarily always a tax but could be a fee, depending on how it is levied. Finally, they point to the legislature's recent enactment of chapter 70.315 RCW, effective July 28, 2013, by which the legislature has found that water purveyors play a public service role of providing water for fire protection and has authorized water purveyors to allocate and recover the costs of fire suppression water facilities and services.

¶57 We understand the PUD and amici to contend that if a water purveyor allocates its costs of fire suppression facilities and services and recovers them as fees, then those fees are revenue from a governmental activity and thereby immune from taxation absent some contrary and explicit legislative intent. Because this case was decided in the trial court on the basis that the PUD was immune from B&O taxation altogether, we have no record indicating whether revenues on which the city of Wenatchee has levied a tax include revenues from hydrant or fire suppression fees that might be immune from tax. The issue, if it exists, must be addressed in the first instance by the trial court.

¶58 We reverse the trial court's declaratory judgment declaring the B&O tax imposed by the city of Wenatchee on the PUD's revenues unlawful and ordering that the city cease charging the PUD taxes on its water system revenues, and remand for further proceedings consistent with this opinion.

BROWN, J., concurs.

¶59 FEARING, J. (concurring) — The issue in this suit is whether a city may tax the revenue received by a public utility district for the sale of domestic water within the city limits. The issue, in turn, is resolved by asking whether the provision of domestic water is a proprietary or governmental function. The author of the lead opinion, as always, provides a thorough analysis and answers correctly that, under the current state of the law, the provision of domestic water is a proprietary function and thus the city of Wenatchee may collect a tax from the Chelan County Public Utility District (PUD). *Russell v. City of Grandview*, 39 Wn.2d 551, 553, 236 P.2d 1061 (1951); *Pub. Util. Dist. No. 1 of Pend Oreille County v. Town of Newport*, 38 Wn.2d 221, 228 P.2d 766 (1951); *City of Moses Lake v. United States*, 430 F. Supp. 2d 1164 (E.D. Wash. 2006). I concur in this ruling.

¶60 I write separately because I consider current distinctions between a proprietary function and a governmental function, particularly in the context of domestic water delivery, to be outdated. If I could decide the case without the weight of precedence, I would consider the distribution of drinking water to be a quintessential governmental function that should not be taxed. If the provision of potable water is not a governmental function, then the public utility district should not engage in the supplying of water but should allow a proprietor to offer the service.

¶61 Washington courts have enunciated various tests for determining whether a function is proprietary or govern-

mental in nature. Sometimes, the tests overlap. Some tests may be inconsistent with other tests. Some tests are more general and others more specific.

¶62 I can identify six tests employed by Washington courts to separate proprietary from governmental functions. First, the principal test in distinguishing the two is whether the act performed is for the common good of all, a governmental function, or whether it is for the special benefit or profit of the corporate entity, a proprietary function. *Skagit County Pub. Hosp. Dist. No. 304 v. Skagit County Pub. Hosp. Dist. No. 1*, 177 Wn.2d 718, 728-29, 305 P.3d 1079 (2013); *Okeson v. City of Seattle*, 150 Wn.2d 540, 550, 78 P.3d 1279 (2003); *Lakoduk v. Cruger*, 47 Wn.2d 286, 288-89, 287 P.2d 338 (1955); *Hagerman v. City of Seattle*, 189 Wash. 694, 701, 66 P.2d 1152 (1937). Second, a governmental function is based on a municipal corporation " '[acting as an arm] of the state . . . to promote the public welfare generally,' " whereas a proprietary function is based on the municipality " 'administer[ing] the local and internal affairs of the territory which is incorporated, for the special benefit and advantage of the urban community embracing within the corporation boundaries.' " *Wash. State Major League Baseball Stadium Pub. Facilities Dist. v. Huber, Hunt & Nichols-Kiewit Constr. Co.*, 165 Wn.2d 679, 687, 202 P.3d 924 (2009) (quoting 1 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 2.09, at 158 (3d ed. 1999)). Third, a public entity acts in a proprietary rather than a governmental capacity when it engages in businesslike activities that are normally performed by private enterprise, whereas governmental functions are those generally performed exclusively by governmental entities. *Fabre v. Town of Ruston*, 180 Wn. App. 150, 321 P.3d 1208 (2014); *Stiefel v. City of Kent*, 132 Wn. App. 523, 529, 132 P.3d 1111 (2006). Fourth, governmental functions involve performing activities for the public health, safety, and welfare. *Fabre*, 180 Wn. App. 150. Fifth, the purchase of a commodity furnished for comfort by a municipality involves a propri-

etary function. *Okeson*, 150 Wn.2d at 550; *Twitchell v. City of Spokane*, 55 Wash. 86, 89, 104 P. 150 (1909). Sixth, a proprietary function comprises the municipal corporation providing a service only to those who request it. *Okeson*, 150 Wn.2d at 550.

¶63 The six tests collide in the context of the supply of domestic water. Potable water is provided by a municipal corporation not for its own profit. The PUD is not a for-profit organization. The PUD provides water for the common good. Water is essential to human life. Thus, under the first and principal test of a governmental function, the provision of domestic water should be considered a governmental function.

¶64 The second test cuts both ways. The conveyance of drinkable water is for the general welfare. Yet, the service, as provided by an individual municipality, is targeted toward a limited urban community. The third test operates in favor of a governmental function. The public sector supplies about 85 percent of water needs.[2] The fourth test also leans in favor of water supply being a governmental function, since water involves the public health and welfare. The fifth and sixth tests militate in favor of water delivery being a proprietary function.

¶65 The six tests listed above lead to some razor thin, if not silly, distinctions, even outside the context of domestic water. Under Washington decisions, provision of electricity serves a proprietary function of the government. *City of Tacoma v. Taxpayers of Tacoma*, 108 Wn.2d 679, 694, 743

---

[2] U.S. Congressional Budget Office, Future Investment in Drinking Water and Wastewater Infrastructure 4 (2002) ("For both drinking water and wastewater, systems owned by the public sector—by local governments or special local or regional government authorities—serve the large majority of households. Although community drinking water systems owned by the private sector account for over half of all such systems, they serve only about 15 percent of households; private wastewater systems that treat household sewage account for roughly 20 percent of the total, but serve few households—perhaps 3 percent."); Joseph L. Sax et al., Legal Control of Water Resources 14 (4th ed. 2006) ("Most urban and suburban water uses, moreover, depend on municipalities and public utilities for their water. The municipality or utility may in turn get its water from a governmental water agency.").

P.2d 793 (1987). Nevertheless, providing streetlights is a governmental function. *Okeson*, 150 Wn.2d at 550. A municipality's operation of traffic signals also involves a sovereign or governmental function. *Okeson*, 150 Wn.2d at 550. On the one hand, dispensing of medical and psychiatric care constitutes a proprietary function. *Petersen v. State*, 100 Wn.2d 421, 671 P.2d 230 (1983). On the other hand, a rural health district furnishing health care services acts in a governmental capacity. *Skagit*, 177 Wn.2d at 729. Construction and maintenance of city streets is a proprietary function. *Goggin v. City of Seattle*, 48 Wn.2d 894, 897, 297 P.2d 602 (1956). But supervision and control of streets is a governmental function. *Goggin*, 48 Wn.2d at 897. Operation of a sewage system is a proprietary function. *Hayes v. City of Vancouver*, 61 Wash. 536, 112 P. 498 (1911). The disposal of waste is a governmental function. *King County v. City of Algona*, 101 Wn.2d 789, 794, 681 P.2d 1281 (1984); *City of Spokane v. Carlson*, 73 Wn.2d 76, 81, 436 P.2d 454 (1968). Finally, as already noted, the provision of domestic water is a proprietary function. *Russell*, 39 Wn.2d at 553. Nevertheless, supplying water for fire protection services is a governmental function. *Stiefel*, 132 Wn. App. at 530.

¶66 *King County*, 101 Wn.2d 789, a tax case like our case, stands for the proposition that operating a solid waste plant is a governmental, not a proprietary, function. I see no relevant distinction between operating a solid waste plant and operating a potable water delivery system. Both fulfill basic human needs for survival, one supplying sanitary drinking water and the other providing sanitary treatment of waste. Although each function can be furnished by a private business, each function is typically provided by a governmental entity. The *Algona* decision does not inform us how customers paid for the service, but I suspect that King County charged a user fee for disposal of waste, a factor supposedly crossing the line into the territory of a proprietary function. King County also likely provided the service only to those who requested it.

¶67 "[A]n ever-growing segment of the population get their drinking water from public entities (62% in 1950; 85% [in 2004])." John D. Leshy, *The Federal Role in Managing the Nation's Groundwater*, 11 HASTINGS W.-NW. J. ENVTL. L. & POL'Y 1, 1 (2004). State or local authorities, delivering the water, function without an aim for profit and instead operate on the ethos of providing an essential service for the common good. Clean and sufficient water supply is paramount to the strength of the nation and local communities.[3] "Clean water and sanitation are crucial to our public health, our quality of life, and our economic prosperity." Janet C. Neuman, *Going with the Flow: A Water Law Journey*, 42 ENVTL. L. 29, 34 (2012); *see also* Lawrence O. Gostin et al., *The Law and the Public's Health: A Study of Infectious Disease Law in the United States*, 99 COLUM. L. REV. 59, 77-78 (1999).

¶68 At least one Washington statute recognizes the provision of domestic water as a governmental service. RCW 36.70A.030(18) defines "urban governmental services" or "urban services" to include

> those public services and public facilities . . . historically and typically provided in cities, specifically including storm and sanitary sewer systems, *domestic water systems*, street cleaning services, fire and police protection services, . . . and public transit services.

(Emphasis added.)

¶69 Other states recognize the importance of the governmental service of domestic water delivery. The provision of potable water is similar in nature to garbage removal, sanitation, and fire protection. *Bjornestad v. Hulse*, 229 Cal.

---

[3] SAX ET AL., *supra*, at 2 ("Along with air, water is our most crucial natural resource."); Barton H. Thompson, Jr., *Water Law as a Pragmatic Exercise: Professor Joseph Sax's Water Scholarship*, 25 ECOLOGY L.Q. 363, 381 (1998) ("[W]hen water is transferred, the community loses a natural resource, which it either began with or acquired earlier through governmental or community efforts. Because of water's inherent importance to an economy, the community also fears that its crucial resources, and thus its options for the future, are reduced.").

App. 3d 1568, 281 Cal. Rptr. 548 (1991). Thus, the California court ruled that a special law, providing that only one designated landowner per parcel in a water district could vote in a district election or be a member of a district's governing board of directors, was unconstitutional under equal protection clauses of the California and United States Constitutions since a water district performed a governmental function.

¶70 In *Washington Township v. Village of Ridgewood*, 26 N.J. 578, 141 A.2d 308 (1958), the New Jersey court noted that to maintain the governmental versus proprietary function as a test with regard to water delivery is specious. That court wrote, and I conclude:

> The distinction is illusory; whatever local government is authorized to do constitutes a function of government, and when a municipality acts pursuant to granted authority it acts as government and not as a private entrepreneur .... Surely the supply of water cannot be deemed to be a second-class activity in the scheme of municipal functions.

141 A.2d at 311.